# LEONIDAS G. TURNER

## vs.

## WILLIAM SPENCER.

*Grounds for Attachment—Loan Procured by Fraud—Evidence.*

One seeking to sustain an attachment for a debt on the ground that it was fraudulently contracted has the burden of proof.

p. 599

An attachment for a debt on the ground that it was for a loan by plaintiff to defendant which was fraudulently contracted cannot be sustained in the absence of evidence that plaintiff was misled by defendant's false representations. p. 599

That defendant, a contractor, being in need of money for his pay roll and also to pay two subcontractors, told plaintiff that he needed it for the latter purpose, and told plaintiff's son that he needed it for both purposes, *held* not to show an express promise by him to use it to pay the subcontractors, so as to authorize an attachment as for fraud in obtaining a loan from plaintiff, he having applied the sum loaned on his pay roll.

p. 599

A promise made by one seeking a loan, as to the application to be made by him of the proceeds, is not ground for attachment merely because he made a different application thereof, unless he intended, at the time of making the promise, not to keep it. p. 600

*Decided June 17th, 1920.*

Appeal from the Baltimore City Court (DUFFY, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS and OFFUTT, JJ.

*George Washington Williams*, with whom was *William R. Price* on the brief, for the appellant.

*Myer Rosenbush*, for the appellee, submitted the cause on brief.

THOMAS, J., delivered the opinion of the Court.

The appellant in this case, Leonidas G. Turner, was engaged in the real estate business in Baltimore City, and interested in the development of suburban property. He had two sons, Percy P. Turner and Robert B. Turner, who were architects, doing business under the name of Turner Architectural Service, and who occupied his office. They prepared the building plans and specifications for those who purchased building lots from their father and supervised the construction of the houses, and in some instances took the contract for the erection of the building and sublet it to other contractors or builders. It seems that the appellant, who, as we have said, was interested in the development of the property, in order to encourage the erection of houses, would sometimes assist the builders or contractors by lending them money to meet their payrolls and other expenses, and that the contractors or builders were paid by the owners of the houses as the work progressed upon certificates of the architects as to the amounts due under the terms of the contracts.

In September, 1919, William Spencer, the appellee, was the contractor for several houses in the course of erection on lots sold by the appellant, and among them was one for O. C. Frazier and one for a Mr. Byrd, and on Friday, September 26th, the appellee went to see the appellant, who had, for several weeks, been lending him the money to carry on the contracts, to borrow $1,000.00 with which to meet his payroll the next day and other pressing obligations. The appellant told him that he was very busy that day and that he should come to see him the next day and he would let him have the money. The following day the appellant gave him the money and took from him two papers, one in the form of a certificate signed by his son, "P. P. Turner, Architect," addressed to O. C. Frazier, certifying that the appellee as contractor was entitled to the sixth payment under the contract, amounting to $600, and a receipt for that amount signed by the appellee, and the other a similar certificate addressed to Mr. Byrd for $400, and a receipt for that amount signed by the appellee. About ten days later the

appellee was so far behind with his obligations under the several contracts referred to that he had to call a meeting of his creditors. At that meeting a committee was formed to take over and complete such of his contracts as, in the judgment of the committee, would be profitable to his creditors. The work under the Byrd contract was completed and the appellant received the $400 mentioned in the certificate and receipt given him for that amount, but the contract for the Frazier house was abandoned by the committee, and the appellant, not having received the $600 mentioned in the certificate and receipt given for that amount, sued out of the Baltimore City Court an attachment on original process against the appellee, the affidavit stating that the appellant had good reason to believe: first, that the appellee had assigned, disposed of, or concealed, or was about to assign, dispose of, or conceal his property, or some portion thereof, with intent to defraud his creditors; second, that the appellee fraudulently contracted the debt of $600 due the appellant. The attachment was laid in the hands of Robert B. and Percy P. Turner, the appellant's sons, who admitted assets in their hands to the amount of $617.40. The appellee filed a motion to quash the attachment on the ground that he had not assigned, etc., and was "not about to assign" his property with intent to defraud his creditors, and that he did not fraudulently contract the debt due the appellant. The case was heard on evidence produced before the Court, and embraced in the bills of exception in the record, and this appeal is from the order of the Court below quashing the attachment.

No evidence was produced in support of the first averment of the affidavit, but the appellant relies upon the evidence offered to sustain the second allegation. The testimony of the plaintiff as to what occurred is as follows: That he is in the real estate business and the plaintiff in this case. That his claim arose in the following manner: "Mr. Spencer was building some houses. My boys were the architects. We occupy the same offices. Spencer came in one Friday afternoon, very much downcast, said that he would have to have

a thousand dollars. There was nothing due him under the terms of the contract which my sons were handling for him or handling in connection with him, and he sat there with his head on his hands for a while very much depressed, and one of my boys asked him what he needed the thousand dollars for, why should he need a thousand dollars, certainly his pay-roll was not that much. Well, he said he needed a thousand dollars to pay the bricklayer on Mr. Frazier's house and the plasterer on Mr. Frazier's house, and yet there was no money due him under the terms of the contract until he had completed the house up to a certain point, until the plastering was finished; he had had the previous payments in various other stages. So I think one of my boys said to me, 'Father, would you like to help Mr. Spencer?' I said, 'Why?' 'Well, it is perfectly safe, you will get this money next week when the house is at a certain state of the contract.' And Spencer spoke up and said, 'Yes, I will be $15,000 to the good when these houses are cleaned up.' When these houses are finished. And moreover he said that he would get certain payments next week, one on this Frazier house and another from another house to reimburse me if I would let him have the money, and as a further inducement he said he would give me 10 per cent. I said, 'Spencer, I would not take any 10 per cent. from you or any compensation whatever if I want to help you and it is perfectly safe, if you say 'I am going to get this money next week,' why, I do not mind letting you have a thousand dollars.' So I gave him the thousand dollars on that representation and he had assigned to me by the architect the payments that would be due, one payment on each of two houses, $400 on one and $600 on the other." On cross-examination he further testified: "At the final division (by the committee of the creditors) of whatever money was coming to Mr. Spencer I received a check for apparently my pro rata share, which check I returned. This was after the whole thing was averaged and after they had stopped work on the Frazier house, on which I was to get my $600. Q. They refused to finish the Frazier house, which is undoubtedly true. You and your sons were connected in this building operation, in other words, the sale of the land was by

you and they as architects and they as the contractors were building these houses, that is true, isn't it? A. That is true. Q. And you were helping to finance Mr. Spencer right along whenever you found that he got in a hole and did not have enough money to pay his payroll? A. I would not say I helped to finance him. I have loaned him these little amounts to be returned the next week or something like that, for which I received no pay. Q. Don't you know as a matter of fact that the $1,000 you gave him was used for his payrolls and to pay off and he did not get a penny out of that money himself? A. No, sir; I do not, and I do not believe it." Percy P. Turner, one of the appellant's sons who was present at the time the money was loaned to the appellee, testified that he was present on the Friday or Saturday, September 26th or 27th, at the time when his father loaned Mr. Spencer $1,000 on these two receipts that have been mentioned. "Q. What was the consideration for that, on what representations, or what was said by Mr. Spencer as an inducement for your father to advance this money, do you know? A. Well, Spencer had contended all along to me that even though he was short of cash for payroll, he was perfectly solvent and he was about, as he and Mr. Stubbs figured it, $18,000 ahead of the game when the houses would be completed. He said about that. I said, 'Well, Spencer, if you cut it in two, nine is not so bad,' and father was there and heard that and it made a pretty good impression, and we thought that any money advanced him would be perfectly safe, especially for the length of a week in which time we expected this plaster payment to be completed. Q. (By Mr. Price) : What representations were made as to how this money would be applied, this $1,000 ? A. Oh, I asked Spencer what he needed a thousand dollars for. I told him I did not think his payroll would be over $500. He said he knew that, but he needed $500, he needed some for the plasterer and some for the bricklayer because the plasterer would not come back on the job until he had paid. So in view of that fact I asked father if he were not willing to let Spencer have a thousand dollars. Q. Did Spencer make any agreement as to where it was to be paid, did he say what he was going to

do with it? A. Well, he simply said he was going out to the buildings right away and probably Mr. Ruby would be waiting for him and he was going to meet Mr. Mather. This is the plasterer, and he was going to make a payment to each of them so that the work would progress, especially to Mr. Mather, because Mr. Mather was the plasterer, he was holding back or not going ahead any further with the work until he got some more payments on account. The next payment was due on this house when the plastering would be completed." Charles G. Mather, who was the plasterer, and Jonas E. Ruby, who worked as a bricklayer on the Frazier house, testified that they did not receive any money from the appellee on September 27th. The appellee states that the appellant had been lending him money from time to time for several weeks to carry on the contracts he had for houses being erected on lots sold by him, and that on Friday the 26th of September he went to see the appellant and told him that he "was head over heels in debt" and that he had to get some one "to get behind him" or he would have to quit because he did not have the money to complete the contracts, and that the appellant told him that he was busy that day but that he would let him have the money the next day; that the next day the appellant gave him $1,000, and he gave the appellant the two receipts we have mentioned; that he used the money "to pay the men working on the job," and did not use one cent of it for other purposes; that the following week the appellant's son "went out and paid the payroll" and got the money back "out of the Byrd job." He positively denies that he told the appellant that if he would lend him the money he would pay the plasterer "so that he would go ahead and finish the work," but says that he did tell him that he owed the plasterer, bricklayer and others some money. He further states that the only reason he gave the appellant the receipt for the money to be paid on the Frazier house was because that was the only house on which there was any money "coming" due, as the other houses were mortgaged, and he gave him the $600 receipt on the Frazier house because they (the appellant and his son) "wanted that one."

This evidence produced by the appellant fails to meet the burden on him to sustain the jurisdictional allegation that the debt was fradulently contracted. *Dumay* v. *Sanchez,* 71 Md. 508. He and his son do not agree as to the amount the appellee said he would realize out of the contracts when completed, and even if they did, and the statement of the appellee could be regarded material as a representation in respect to an ascertainable fact, as distinguished from a statement of opinion, judgment or expectation (*Buschman & Cook* v. *Codd,* 52 Md. 207; *Robertson* v. *Parks,* 76 Md. 132; *Johnson* v. *Stockham,* 89 Md. 364), the appellant's son, at whose suggestion and request the appellant made the loan, evidently did not rely on it, and it is not probable that the appellant believed, or could have been misled by such a statement from one who was so "depressed" as he says the appellee was because of financial embarrassment. *Palmer* v. *Hughes,* 84 Md. 663.

Nor does the testimony of the appellant and his son furnish satisfactory evidence of a false statement by the appellee of the purpose for which he was borrowing the money. The appellant says the appellee told him that he "needed a thousand dollars to pay the bricklayer on Mr. Frazier's house and the plasterer on Mr. Frazier's house," while his son states that the appellee told him that he needed $500 for his payroll and "needed some for the plasterer and some for the bricklayer," and the undisputed fact in the case is that he was in need of money for both purposes, and that he used it "to pay the men that were working on the job," and "did not use a cent of it" for any other purpose. There is no evidence of an express promise by the appellee to apply the money to the payment of the amount he owed the plasterer and the bricklayer engaged on the Frazier house, and the appellee states positively that he never made such a promise. But even if he did it would not amount to fraud, unless he intended, at the time he made the promise, not to keep it, and there is no evidence of such intention. In the case of *Johnson* v. *Stockham, supra,* JUDGE PEARCE, speaking for the

Court, said: "Nor does the record disclose any conduct or circumstances tending to create a suspicion that the debts were in fact fraudulently contracted, notwithstanding the denial of Stockham. The testimony of the appellant, accepted at its utmost value, and without regard to Stockham's countervailing testimony, would only prove a promise to deliver the wheat when threshed—that he might, out of the proceeds of sale, retain the debt due him, and it is well settled that, in an action for deceit, a false statement, in order to constitute actionable fraud, must be of a material fact, at the time, or previously, existing, made for the purpose of being acted on, and not a mere promise for the future. * * * The representation to be material must be in respect of an existing fact. * * * 'Fraud cannot be predicated of a promise not performed, for the purpose of avoiding a bargain of any kind.' * * * It is true that where one, at the time intending not to pay for goods, induces the owner to sell them on credit, it is a debt fraudulently contracted, and the creditor may reclaim the goods, if they have not passed into the hands of a *bona fide* purchaser, or he may proceed by attachment under the statute, but there must have been in the mind of the vendee, at the time, an actual intention to cheat, or to do an act the necessary result of which will be to defraud the seller. * * * But this intention is not made to appear by the showing of a mere promise to do some future act, and the subsequent failure to fulfill such promise. *Diggs* v. *Denny,* 86 Md. 129."

There are five exceptions in the record to rulings of the Court below on the evidence. These exceptions were not seriously pressed in this Court, and we do not find reversible error in any of the rulings. The evidence referred to in the first exception was not excluded by the Court, and the plaintiff got the benefit of the question and answer, and the plaintiff could not have been injured by the admission of the evidence mentioned in the other exceptions.

*Order affirmed, with costs.*